(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AT&T CORP. *v.* HULTEEN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–543.   Argued December 10, 2008—Decided May 18, 2009

Petitioner companies (collectively, AT&T) long based pension calculations on a seniority system that relied on years of service minus uncredited leave time, giving less retirement credit for pregnancy absences than for medical leave generally.  In response to the ruling in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, that such differential treatment of pregnancy leave was not sex-based discrimination prohibited by Title VII of the Civil Rights Act of 1964, Congress added the Pregnancy Discrimination Act (PDA) to Title VII in 1978 to make it "clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions," *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 684.  On the PDA's effective date, AT&T replaced its old plan with the Anticipated Disability Plan, which provided the same service credit for pregnancy leave as for other disabilities prospectively, but did not make any retroactive adjustments for the pre-PDA personnel policies.  Each of the individual respondents therefore received less service credit for her pre-PDA pregnancy leave than she would have for general disability leave, resulting in a reduction in her total employment term and, consequently, smaller AT&T pensions.  They, along with their union, also a respondent, filed Equal Employment Opportunity Commission charges alleging discrimination based on sex and pregnancy in violation of Title VII.  The EEOC issued each respondent (collectively, Hulteen) a determination letter finding reasonable cause to believe AT&T had discriminated and a right-to-sue letter.  Hulteen filed suit in the District Court, which held itself bound by a Ninth Circuit precedent finding a Title VII violation where post-PDA retirement eligibility calculations incorporated pre-PDA accrual rules that differentiated based on pregnancy.  The Circuit affirmed.

*Held:* An employer does not necessarily violate the PDA when it pays pension benefits calculated in part under an accrual rule, applied only pre-PDA, that gave less retirement credit for pregnancy than for medical leave generally. Because AT&T's pension payments accord with a bona fide seniority system's terms, they are insulated from challenge under Title VII §703(h). Pp. 4–14.

    (a) AT&T's benefit calculation rule is protected by §703(h), which provides: "[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of . . . sex." In *Teamsters* v. *United States*, 431 U. S. 324, 356, the Court held that a pre-Title VII seniority system that disproportionately advantaged white, as against minority, employees nevertheless exemplified a bona fide system without any discriminatory terms under §703(h), where the discrimination resulted from the employer's hiring practices and job assignments. Because AT&T's system must also be viewed as bona fide, *i.e.,* as a system having no discriminatory terms, §703(h) controls the result here, just as it did in *Teamsters*. This Court held in *Gilbert* that an accrual rule limiting the seniority credit for time taken for pregnancy leave did not unlawfully discriminate on the basis of sex. As a matter of law, at that time, "an exclusion of pregnancy from a disability-benefits plan providing general coverage [was] not a gender-based discrimination at all." 429 U. S., at 136. The only way to conclude that §703(h) does not protect AT&T's system would be to read the PDA as applying retroactively to recharacterize AT&T's acts as having been illegal when done. This is not a serious possibility. Generally, there is "a presumption against retroactivity [unless] Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 272–273. There is no such clear intent here. Section 706(e)(2)—which details when "an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose"—has no application because *Gilbert* unquestionably held that the feature of AT&T's seniority system at issue here was not discriminatory when adopted, let alone intentionally so. Nor can it be argued that because AT&T could have chosen to give post-PDA credit to pre-PDA pregnancy leave when Hulteen retired, its failure to do so was facially discriminatory at that time. If a choice to rely on a favorable statute turned every past differentiation into contemporary discrimination, §703(h) would never apply. Finally, *Bazemore* v. *Friday*, 478 U. S. 385—in which a pre-Title VII compensation plan giving black em-

ployees less pay than whites was held to violate Title VII on its effective date—is inapplicable because the *Bazemore* plan did not involve a seniority system subject to §703(h) and the employer there failed to eliminate the discriminatory practice when Title VII became law. Pp. 4–13.

(b) A recent §706(e) amendment making it "an unlawful employment practice . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including each time . . . benefits [are] paid, resulting . . . from such a decision," §3(A), 123 Stat. 6, does not help Hulteen. AT&T's pre-PDA decision not to award Hulteen service credit for pregnancy leave was not discriminatory, with the consequence that Hulteen has not been "affected by application of a discriminatory compensation decision or other practice." Pp. 13–14.

498 F. 3d 1001, reversed.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. STEVENS, J., filed a concurring opinion. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–543

_____

## AT&T CORPORATION, PETITIONER *v.* NOREEN HULTEEN ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 18, 2009]

JUSTICE SOUTER delivered the opinion of the Court.

The question is whether an employer necessarily violates the Pregnancy Discrimination Act (PDA), 42 U. S. C. §2000e(k), when it pays pension benefits calculated in part under an accrual rule, applied only prior to the PDA, that gave less retirement credit for pregnancy leave than for medical leave generally. We hold there is no necessary violation; and the benefit calculation rule in this case is part of a bona fide seniority system under §703(h) of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–2(h), which insulates it from challenge.

I

Since 1914, AT&T Corporation (then American Telephone & Telegraph Company) and its Bell System Operating Companies, including Pacific Telephone and Telegraph Company (hereinafter, collectively, AT&T),[1] have provided

_____

[1] In 1982, a consent decree and Modified Final Judgment (MFJ) were entered to resolve the Government's antitrust suit against American Telephone & Telegraph Company. The MFJ resulted in the break-up of American Telephone & Telegraph and the divestiture of the local Bell System Operating Companies, including Pacific Telephone and Tele-

pensions and other benefits based on a seniority system that relies upon an employee's term of employment, understood as the period of service at the company minus uncredited leave time.[2]

In the 1960s and early to mid-1970s, AT&T employees on "disability" leave got full service credit for the entire periods of absence, but those who took "personal" leaves of absence received maximum service credit of 30 days. Leave for pregnancy was treated as personal, not disability. AT&T altered this practice in 1977 by adopting its Maternity Payment Plan (MPP), entitling pregnant employees to disability benefits and service credit for up to six weeks of leave. If the absence went beyond six weeks, however, it was treated as personal leave, with no further benefits or credit, whereas employees out on disability unrelated to pregnancy continued to receive full service credit for the duration of absence. This differential treatment of pregnancy leave, under both the pre-1977 plan and the MPP, was lawful: in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), this Court concluded that a disability benefit plan excluding disabilities related to pregnancy

───────────

graph Company (PT&T). Many employees of the former Bell System Operating Companies became employees of the new AT&T Corporation. The Plan of Reorganization, approved by the United States District Court for the District of Columbia, *United States* v. *Western Elec. Co.*, 569 F. Supp. 1057, aff'd *sub nom. California* v. *United States*, 464 U. S. 1013 (1983), provided that "all employees will carry with them all pre-divestiture Bell System service regardless of the organizational unit or corporation by which they are employed immediately after divestiture." App. 54. Respondents in this case were employed at PT&T. After the divestiture of the Bell Operating Companies in 1984, these women became employees of AT&T Corporation and their service calculations, as computed by PT&T under its accrual rules, were carried over to AT&T Corporation.

[2] AT&T's calculation of a term of employment is a more complicated endeavor, requiring the creation and maintenance of an individual "start date" for each employee, which is adjusted based on the relevant leave policy.

was not sex-based discrimination within the meaning of
Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as
amended, 42 U. S. C. §2000e *et seq*.

In 1978, Congress amended Title VII by passing the
PDA, 92 Stat. 2076, 42 U. S. C. §2000e(k), which super-
seded *Gilbert* so as to make it "clear that it is discrimina-
tory to treat pregnancy-related conditions less favorably
than other medical conditions." *Newport News Shipbuild-
ing & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 684 (1983).
On April 29, 1979, the effective date of the PDA, AT&T
adopted its Anticipated Disability Plan which replaced the
MPP and provided service credit for pregnancy leave on
the same basis as leave taken for other temporary disabili-
ties. AT&T did not, however, make any retroactive ad-
justments to the service credit calculations of women who
had been subject to the pre-PDA personnel policies.

Four of those women are named respondents in this
case. Each of them received less service credit for preg-
nancy leave than she would have accrued on the same
leave for disability: seven months less for Noreen Hulteen;
about six months for Eleanora Collet; and about two for
Elizabeth Snyder and Linda Porter. Respondents
Hulteen, Collet, and Snyder have retired from AT&T;
respondent Porter has yet to. If her total term of employ-
ment had not been decreased due to her pregnancy leave,
each would be entitled to a greater pension benefit.

Eventually, each of the individual respondents and
respondent Communications Workers of America (CWA),
the collective-bargaining representative for the majority of
AT&T's nonmanagement employees, filed charges of dis-
crimination with the Equal Employment Opportunity
Commission (EEOC), alleging discrimination on the basis
of sex and pregnancy in violation of Title VII. In 1998, the
EEOC issued a Letter of Determination finding reasonable
cause to believe that AT&T had discriminated against
respondent Hulteen and "a class of other similarly-

situated female employees whose adjusted [commencement of service] date has been used to determine eligibility for a service or disability pension, the amount of pension benefits, and eligibility for certain other benefits and programs, including early retirement offerings." App. 54–55. The EEOC issued a notice of right to sue to each named respondent and the CWA (collectively, Hulteen), and Hulteen filed suit in the United States District Court for the Northern District of California.

On dueling motions for summary judgment, the District Court held itself bound by a prior Ninth Circuit decision, *Pallas* v. *Pacific Bell*, 940 F. 2d 1324 (1991), which found a Title VII violation where post-PDA retirement eligibility calculations incorporated pre-PDA accrual rules that differentiated on the basis of pregnancy. See App. to Pet. for Cert. 121a–122a. The Circuit, en banc, affirmed and held that *Pallas*'s conclusion that "calculation of service credit excluding time spent on pregnancy leave violates Title VII was, and is, correct." 498 F. 3d 1001, 1003 (2007).

The Ninth Circuit's decision directly conflicts with the holdings of the Sixth and Seventh Circuits that reliance on a pre-PDA differential accrual rule to determine pension benefits does not constitute a current violation of Title VII. See *Ameritech Benefit Plan Comm.* v. *Communication Workers of Am.*, 220 F. 3d 814 (CA7 2000) (finding no actionable Title VII violation given the existence of a bona fide seniority system); *Leffman* v. *Sprint Corp.*, 481 F. 3d 428 (CA6 2007) (characterizing claim as challenging the continuing effects of past discrimination rather than alleging a current Title VII violation). We granted certiorari in order to resolve this split, 554 U. S. __ (2008), and now reverse the judgment of the Ninth Circuit.

## II

Title VII makes it an "unlawful employment practice"

for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U. S. C. §2000e–2(a)(1). Generally, a claim under Title VII must be filed "within one hundred and eighty days after the alleged unlawful employment practice occurred," §2000e–5(e)(1). In this case, Hulteen has identified the challenged practice as applying the terms of AT&T's seniority system to calculate and pay pension benefits to women who took pregnancy leaves before April 29, 1979. She says the claim is timely because the old service credit differential for pregnancy leave was carried forward through the system's calculations so as to produce an effect in the amount of the benefit when payments began.

There is no question that the payment of pension benefits in this case is a function of a seniority system, given the fact that calculating benefits under the pension plan depends in part on an employee's term of employment. As we have said, "[a] 'seniority system' is a scheme that, alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase." *California Brewers Assn.* v. *Bryant*, 444 U. S. 598, 605–606 (1980) (footnote omitted). Hulteen is also undoubtedly correct that AT&T's personnel policies affecting the calculation of any employee's start date should be considered "ancillary rules" and elements of the system, necessary for it to operate at all, being rules that "define which passages of time will 'count' towards the accrual of seniority and which will not." *Id.*, at 607.

But contrary to Hulteen's position, establishing the continuity of a seniority system whose results depend in part on obsolete rules entailing disadvantage to once-pregnant employees does not resolve this case. Although adopting a service credit rule unfavorable to those out on

pregnancy leave would violate Title VII today, a seniority system does not necessarily violate the statute when it gives current effect to such rules that operated before the PDA. "[S]eniority systems are afforded special treatment under Title VII," *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 81 (1977), reflecting Congress's understanding that their stability is valuable in its own right. Hence, §703(h):

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ." 42 U. S. C. §2000e–2(h).

Benefit differentials produced by a bona fide seniority-based pension plan are permitted unless they are "the result of an intention to discriminate." *Ibid.*[3]

———————

[3] Section 701(k) of Title VII provides that "women affected by pregnancy, . . . shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section [703(h)] of this title shall be interpreted to permit otherwise." 42 U. S. C. §2000e(k). Hulteen contends that, in light of this language, §703(h) does not apply at all to claims of fringe-benefit discrimination under the PDA. We cannot agree. Hulteen's reading would result in the odd scenario that pregnancy discrimination, alone among all categories of discrimination (race, color, religion, other sex-based claims, and national origin), would receive dispensation from the general application of subsection (h).

A better explanation is that §701(k) refers only to the final sentence of §703(h), which reads that "[i]t shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differen-

In *Teamsters* v. *United States*, 431 U. S. 324 (1977), advantages of a seniority system flowed disproportionately to white, as against minority, employees, because of an employer's prior discrimination in job assignments. We recognized that this "disproportionate distribution of advantages does in a very real sense operate to freeze the status quo of prior discriminatory employment practices[,] [b]ut both the literal terms of §703(h) and the legislative history of Title VII demonstrate that Congress considered this very effect of many seniority systems and extended a measure of immunity to them." *Id.*, at 350 (internal quotation marks omitted). "[T]he unmistakable purpose of §703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII." *Id.*, at 352. The seniority system in *Teamsters* exemplified a bona fide system without any discriminatory terms (the discrimination having occurred in executive action hiring employees and assigning jobs), so that the Court could conclude that the system "did not have its genesis in . . . discrimination, and . . . has been maintained free from any illegal purpose." *Id.*, at 356.

AT&T's system must also be viewed as bona fide, that

––––––––––

tiation is authorized by the provisions of section 206(d) of title 29." 42 U. S. C. §2000e–2(h). This final sentence of subsection (h), referred to as the Bennett Amendment, served to reconcile the Equal Pay Act of 1963, 77 Stat. 56, 29 U. S. C. §206(d), with Title VII. See *County of Washington* v. *Gunther*, 452 U. S. 161, 194 (1981) (Rehnquist, J., dissenting). In *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), this Court had concluded that the amendment permitted wage discrimination based on pregnancy. *Id.*, at 144–145. By adding the language, "nothing in section [703(h)] of this title shall be interpreted to permit otherwise," to the PDA, 42 U. S. C. §2000e(k), Congress wanted to ensure that, in addition to replacing *Gilbert* with a rule that discrimination on the basis of pregnancy is sex discrimination, it foreclosed the possibility that this Court's interpretation of the Bennett Amendment could be construed, going forward, to permit wage discrimination based on pregnancy.

is, as a system that has no discriminatory terms, with the consequence that subsection (h) controls the result here, just as in *Teamsters*. It is true that in this case the pre-April 29, 1979 rule of differential treatment was an element of the seniority system itself; but it did not taint the system under the terms of subsection (h), because this Court held in *Gilbert* that an accrual rule limiting the seniority credit for time taken for pregnancy leave did not unlawfully discriminate on the basis of sex. As a matter of law, at that time, "an exclusion of pregnancy from a disability-benefits plan providing general coverage [was] not a gender-based discrimination at all." 429 U. S., at 136.[4] Although the PDA would have made it discriminatory to continue the accrual policies of the old rule, AT&T amended that rule as of the effective date of the Act, April 29, 1979; the new one, treating pregnancy and other temporary disabilities the same way, remains a part of AT&T's seniority system today.

This account of litigation, legislation, and the evolution of the system's terms is the answer to Hulteen's argument that *Teamsters* supports her position. She correctly points out that a "seniority system that perpetuates the effects of

---

[4] *Gilbert* recognized that differential treatment could still represent intentionally discriminatory treatment if pretextual, 429 U. S., at 136, and that a forbidden discriminatory effect could result if a disability-benefits plan produced overall preferential treatment for one sex, *id.*, at 138. Neither theory is advanced here.

In *Nashville Gas Co.* v. *Satty*, 434 U. S. 136 (1977), we reaffirmed our holding in *Gilbert* that Title VII "did not require that greater economic benefits be paid to one sex or the other 'because of their differing roles in "the scheme of human existence." ' " *Id.*, at 142 (quoting *Gilbert*, *supra*, at 139, n. 17). But we noted that *Gilbert*'s holding did not extend to "permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role." *Satty*, *supra*, at 142. Cancellation of benefits previously accrued, therefore, was considered facially violative at the time, but such a situation is not presented here.

pre-Act discrimination cannot be bona fide if an intent to discriminate entered into its very adoption," 431 U. S., at 346, n. 28, and she would characterize AT&T's seniority system as intentionally discriminatory, on the theory that the accrual rule for pregnancy leave was facially discriminatory from the start. She claims further support from *Automobile Workers* v. *Johnson Controls, Inc.*, 499 U. S. 187 (1991), in which we said that "explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination," and that such facial discrimination is intentional discrimination even if not based on any underlying malevolence. *Id.*, at 199. Hulteen accordingly claims that the superseded differential affecting current benefits was, and remains, "discriminatory in precisely the way the PDA prohibits," Brief for Respondents 18.

But *Automobile Workers* is not on point. The policy in that case, prohibiting women from working in jobs with lead exposure unless they could show themselves incapable of child bearing, was put in place after the PDA became law and under its terms was facially discriminatory. In this case, however, AT&T's intent when it adopted the pregnancy leave rule (before the PDA) was to give differential treatment that as a matter of law, as *Gilbert* held, was not gender-based discrimination. Because AT&T's differential accrual rule was therefore a permissible differentiation given the law at the time, there was nothing in the seniority system at odds with the subsection (h) bona fide requirement. The consequence is that subsection (h) is as applicable here as it was in *Teamsters*, and the calculations of credited service that determine pensions are the results of a permissibly different standard under subsection (h) today.[5]

---

[5] Although certain circuit courts had previously concluded that treating pregnancy leave less favorably than other disability leave consti-

The only way to conclude here that the subsection would not support the application of AT&T's system would be to read the PDA as applying retroactively to recharacterize the acts as having been illegal when done, contra *Gilbert*.[6] But this is not a serious possibility. As we have said,

> "[b]ecause it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 272–273 (1994).

There is no such clear intent here, indeed, no indication at all that Congress had retroactive application in mind; the evidence points the other way. Congress provided for the PDA to take effect on the date of enactment, except in its application to certain benefit programs, as to which effectiveness was held back 180 days. Act of Oct. 31, 1978, §2(b), 92 Stat. 2076, 42 U. S. C. §2000e(k) (1979 ed.). The House Report adverted to these benefit schemes:

> "As the *Gilbert* decision permits employers to exclude

_____

tuted sex discrimination under Title VII, this Court in *Gilbert* clearly rejected that conclusion, 429 U. S., at 147 (Brennan, J., dissenting); see also *id.*, at 162 (STEVENS, J., dissenting). *Gilbert* declared the meaning and scope of sex discrimination under Title VII and held that previous views to the contrary were wrong as a matter of law. And "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers* v. *Roadway Express, Inc.*, 511 U. S. 298, 312–313 (1994); see also *id.*, at 313, n. 12. It is therefore to no avail to argue that the pregnancy leave cap was unlawful before *Gilbert* and that the PDA returned the law to its prior state.

[6] In so saying, we assume that §701(k) has no application, as explained in footnote 3, *supra*. Cf. *post*, at 4–6 (GINSBURG, J., dissenting).

pregnancy-related coverage from employee benefit plans, [the bill] provides for [a] transition period of 180 days to allow employees *[sic]* to comply with the explicit provisions of this amendment. It is the committee's intention to provide for an orderly and equitable transition, with the least disruption for employers and employees, consistent with the purposes of the bill." H. R. Rep. No. 95–948, p. 8 (1978).

This is the language of prospective intent, not retrospective revision.

Hulteen argues that she nonetheless has a challenge to AT&T's current payment of pension benefits under §706(e)(2) of Title VII, believing (again mistakenly) that this subsection affects the validity of any arrangement predating the PDA that would be facially discriminatory if instituted today. Brief for Respondents 27–29. Section 706(e)(2) provides that

> "an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system." 42 U. S. C. §2000e–5(e)(2).

But, as the text makes clear, this subsection determines the moments at which a seniority system violates Title VII only if it is a system "adopted for an intentionally discriminatory purpose in violation of this subchapter." As discussed above, the Court has unquestionably held that the feature of AT&T's seniority system at issue was not discriminatory when adopted, let alone intentionally so in violation of this subchapter. That leaves §706(e)(2) with-

out any application here.

It is equally unsound for Hulteen to argue that when she retired AT&T could have chosen to give post-PDA credit to pre-PDA pregnancy leave, making its failure to do so facially discriminatory at that time.[7] If a choice to rely on a favorable statute turned every past differentiation into contemporary discrimination, subsection (h) would never apply.

Hulteen's remaining argument (as of the time the case was submitted to us) is that our decision in *Bazemore* v. *Friday*, 478 U. S. 385 (1986) *(per curiam)*, is on her side. In *Bazemore*, black employees of the North Carolina Agricultural Extension Service, who received less pay than comparable whites under a differential compensation plan extending back to pre-Title VII segregation, brought suit in 1971 claiming that pay disparities persisted. *Id.*, at 389–391. We concluded that "[a] pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute." *Id.*, at 395.

*Bazemore* has nothing to say here. To begin with, it did not involve a seniority system subject to subsection (h); rather, the employer in *Bazemore* had a racially based pay structure under which black employees were paid less than white employees. Further, after Title VII became law, the employer failed to eliminate the discriminatory practice, even though the new statute had turned what once was legally permissible into something unlawful. *Bazemore* would be on point only if, after the PDA, AT&T

---

[7]To the extent Hulteen means to claim, as a factual matter, that the accrual rule was merely advisory, requiring a fresh choice to apply it in the benefit context, she points to nothing in the record supporting such a proposition.

continued to apply an unfavorable credit differential for pregnancy leave simply because it had begun to do that before the PDA. AT&T's system, by contrast, provides future benefits based on past, completed events, that were entirely lawful at the time they occurred.

## III

We have accepted supplemental briefing after the argument on the possible effect on this case of the recent amendment to §706(e) of Title VII, adopted in response to *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618 (2007), and dealing specifically with discrimination in compensation:

> "For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111–2, §3(A), 123 Stat. 5–6.

Hulteen argues that payment of the pension benefits at issue in this case marks the moment at which she "is affected by application of a discriminatory compensation decision or other practice," and she reads the statute as providing that such a "decision or other practice" may not be applied to her disadvantage.

But the answer to this claim is essentially the same as the answer to Hulteen's argument that §706(e)(2) helps her, *supra*, at 11–12. For the reasons already discussed,

AT&T's pre-PDA decision not to award Hulteen service credit for pregnancy leave was not discriminatory, with the consequence that Hulteen has not been "affected by application of a discriminatory compensation decision or other practice." §3(A), 123 Stat. 6.

## IV

Bona fide seniority systems allow, among other things, for predictable financial consequences, both for the employer who pays the bill and for the employee who gets the benefit. Cf. *Central Laborers' Pension Fund* v. *Heinz*, 541 U. S. 739, 743 (2004) (noting that the central feature of the Employee Retirement Income Security Act of 1974, 29 U. S. C. §1001 *et seq.*, is its "object of protecting employees' justified expectations of receiving the benefits their employers promise them"). As §703(h) demonstrates, Congress recognized the salience of these reliance interests and, where not based upon or resulting from an intention to discriminate, gave them protection. Because the seniority system run by AT&T is bona fide, the judgment of the Court of Appeals for the Ninth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–543

———————

## AT&T CORPORATION, PETITIONER *v.* NOREEN HULTEEN ET AL.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

[May 18, 2009]

JUSTICE STEVENS, concurring.

Today my appraisal of the Court's decision in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), is the same as that expressed more than 30 years ago in my dissent. I therefore agree with much of what JUSTICE GINSBURG has to say in this case. Nevertheless, I must accept *Gilbert*'s interpretation of Title VII as having been the governing law until Congress enacted the Pregnancy Discrimination Act. Because this case involves rules that were in force only prior to that Act, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

No. 07–543

AT&T CORPORATION, PETITIONER *v.* NOREEN
HULTEEN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 18, 2009]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins,
dissenting.

In *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), this
Court held that a classification harmful to women based
on pregnancy did not qualify as discrimination "because of
. . . sex" prohibited by Title VII of the Civil Rights Act of
1964.  42 U. S. C. §2000e–2(a)(1).  Exclusion of pregnancy
from an employer's disability benefits plan, the Court
ruled, "is not a gender-based discrimination at all."  429
U. S., at 136.  See also *id.*, at 138 (describing G. E.'s plan
as "facially nondiscriminatory" and without "any gender-
based discriminatory effect").[1]  In dissent, JUSTICE
STEVENS wondered how the Court could come to that
conclusion, for "it is the capacity to become pregnant
which primarily differentiates the female from the male."
*Id.*, at 162.

Prior to *Gilbert*, all Federal Courts of Appeals presented

_____

[1] The Court's opinion in *Gilbert* extended to Title VII reasoning ear-
lier advanced in *Geduldig* v. *Aiello*, 417 U. S. 484 (1974).  In that case,
the Court upheld against an equal protection challenge California's
disability insurance system, which excluded coverage for disabilities
occasioned by normal pregnancy.  California's system, the Court noted,
did not divide workers according to their sex; instead, it "divide[d]
potential recipients into two groups—pregnant women and nonpreg-
nant persons."  *Id.*, at 496–497, n. 20.

with the question had determined that pregnancy dis-
crimination violated Title VII.[2]  Guidelines issued in 1972
by the Equal Employment Opportunity Commission
(EEOC or Commission) declared that disadvantageous
classifications of employees based on pregnancy-related
conditions are "in prima facie violation of Title VII."  37
Fed. Reg. 6837 (1972).  In terms closely resembling the
EEOC's current Guideline, see 29 CFR §1604.10 (2008),
the Commission counseled:

> "Written and unwritten employment policies and
> practices involving . . . the accrual of seniority and
> other benefits and privileges . . . shall be applied to
> disability due to pregnancy or childbirth on the same
> terms and conditions as they are applied to other
> temporary disabilities."  37 Fed. Reg. 6837.

The history of women in the paid labor force underpinned
and corroborated the views of the lower courts and the

_____

[2] See *Communications Workers of America* v. *AT&T Co., Long Lines
Dept.*, 513 F. 2d 1024 (CA2 1975); *Wetzel* v. *Liberty Mut. Ins. Co.*, 511 F.
2d 199 (CA3 1975), vacated on other grounds and remanded, 424 U. S.
737 (1976); *Gilbert* v. *General Elec. Co.*, 519 F. 2d 661 (CA4 1975), rev'd,
429 U. S. 125 (1976); *Satty* v. *Nashville Gas Co.*, 522 F. 2d 850 (CA6
1975), aff'd in part, vacated in part, and remanded, 434 U. S. 136
(1977); *Holthaus* v. *Compton & Sons, Inc.* 514 F. 2d 651 (CA8 1975);
*Berg* v. *Richmond Unified School Dist.*, 528 F. 2d 1208 (CA9 1975);
*Hutchison* v. *Lake Oswego School Dist. No. 7*, 519 F. 2d 961 (CA9 1975).

For decisions under state human rights laws to the same effect, see,
*e.g.*, *Brooklyn Union Gas Co.* v. *New York State Human Rights Appeal
Bd.*, 41 N. Y. 2d 84, 359 N. E. 2d 393 (1976); *Anderson* v. *Upper Bucks
Cty. Area Vocational Technical School*, 30 Pa. Commw. 103, 373 A. 2d
126 (1977); *Quaker Oats Co.* v. *Cedar Rapids Human Rights Comm'n*,
268 N. W. 2d 862 (Iowa 1978); *Massachusetts Elec. Co.* v. *Massachusetts
Comm'n Against Discrimination*, 375 Mass. 160, 375 N. E. 2d 1192
(1978); *Minnesota Min. & Mfg. Co.* v. *State*, 289 N. W. 2d 396 (Minn.
1979); *Michigan Dept. of Civil Rights ex rel. Jones* v. *Michigan Dept. of
Civil Serv.*, 101 Mich. App. 295, 301 N. W. 2d 12 (1980); *Badih* v. *Myers*,
36 Cal. App. 4th 1289, 43 Cal. Rptr. 2d 229 (1995).

EEOC. In generations preceding—and lingering long after—the passage of Title VII, that history demonstrates, societal attitudes about pregnancy and motherhood severely impeded women's employment opportunities. See Molnar, "Has the Millennium Yet Dawned?": A History of Attitudes Toward Pregnant Workers in America, 12 Mich. J. Gender & L. 163, 170–176 (2005); S. Kamerman, A. Kahn, & P. Kingston, Maternity Policies and Working Women 32–38 (1983).

Congress swiftly reacted to the *Gilbert* decision. Less than two years after the Court's ruling, Congress passed the Pregnancy Discrimination Act of 1978 (PDA) to overturn *Gilbert* and make plain the legislators' clear understanding that discrimination based on pregnancy *is* discrimination against women.[3] The Act amended Title VII to require that women affected by pregnancy "be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." 42 U. S. C. §2000e(k).

The PDA does not require redress for past discrimination. It does not oblige employers to make women whole for the compensation denied them when, prior to the Act, they were placed on pregnancy leave, often while still ready, willing, and able to work, and with no secure right to return to their jobs after childbirth.[4] But the PDA does

———————

[3] See, *e.g.*, H. R. Rep. No. 95–948, p. 3 (1978) ("[T]he assumption that women will become pregnant and leave the labor force . . . is at the root of the discriminatory practices which keep women in low-paying and dead-end jobs.").

[4] For examples of once prevalent restrictions, see *Turner* v. *Utah Dept. of Employment Security*, 423 U. S. 44 (1975) *(per curiam)* (state statute made pregnant women ineligible for unemployment benefits for a period extending from 12 weeks before the expected date of childbirth until six weeks after childbirth); *Cleveland Bd. of Ed.* v. *LaFleur*, 414 U. S. 632, 634–635 (1974) (school board rule forced pregnant public

protect women, from and after April 1979, when the Act became fully effective, against repetition or continuation of pregnancy-based disadvantageous treatment.

Congress interred *Gilbert* more than 30 years ago, but the Court today allows that wrong decision still to hold sway. The plaintiffs (now respondents) in this action will receive, for the rest of their lives, lower pension benefits than colleagues who worked for AT&T no longer than they did. They will experience this discrimination not simply because of the adverse action to which they were subjected pre-PDA. Rather, they are harmed today because AT&T has refused fully to heed the PDA's core command: Hereafter, for "*all* employment-related purposes," disadvantageous treatment "on the basis of pregnancy, childbirth, or related medical conditions" must cease. 42 U. S. C. §2000e(k) (emphasis added). I would hold that AT&T committed a current violation of Title VII when, post-PDA, it did not totally discontinue reliance upon a pension calculation premised on the notion that pregnancy-based classifications display no gender bias.

I

Enacted as an addition to the section defining terms used in Title VII, the PDA provides:

"The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including

––––––––––

school teachers to take unpaid maternity leave five months before the expected date of childbirth, with no guarantee of re-employment). Cf. *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 736–737 (2003) (sex discrimination, Congress recognized, is rooted, primarily, in stereotypes about "women when they are mothers or mothers-to-be" (internal quotation marks omitted)).

receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ." 42 U. S. C. §2000e(k).

The text of the Act, this Court has acknowledged, "unambiguously expressed [Congress'] disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678 (1983). "Proponents of the [PDA]," the Court observed, "repeatedly emphasized that the Supreme Court had erroneously interpreted congressional intent and that amending legislation was necessary to reestablish the principles of Title VII law as they had been understood prior to the *Gilbert* decision." *Id.*, at 679. See also *California Fed. Sav. & Loan Assn.* v. *Guerra*, 479 U. S. 272, 284–285 (1987) (explaining that "the first clause of the PDA reflects Congress' disapproval of the reasoning in *Gilbert*," while "the second clause . . . illustrate[s] how discrimination against pregnancy is to be remedied"). Cf. *Newport News*, 462 U. S., at 694 (Rehnquist, J., dissenting) (criticizing the Court for concluding that the PDA "renders all of *Gilbert* obsolete").

Today's case presents a question of time. As the Court comprehends the PDA, even after the effective date of the Act, lower pension benefits perpetually can be paid to women whose pregnancy leaves predated the PDA. As to those women, the Court reasons, the disadvantageous treatment remains as *Gilbert* declared it to be: "facially nondiscriminatory," and without "any gender-based discriminatory effect," 429 U. S., at 138. See *ante*, at 8.

There is another way to read the PDA, one better attuned to Congress' "unambiguou[s] . . . disapproval of both the holding and the reasoning" in *Gilbert*. *Newport News*, 462 U. S., at 678. On this reading, the Act calls for an immediate end to any pretense that classification on the basis of pregnancy can be "facially nondiscriminatory."

While the PDA does not reach back to redress discrimination women encountered before Congress overruled *Gilbert*, the Act instructs employers forthwith to cease and desist: From and after the PDA's effective date, classifications treating pregnancy disadvantageously must be recognized, "for all employment-related purposes," including pension payments, as discriminatory both on their face and in their impact. So comprehended, the PDA requires AT&T to pay Noreen Hulteen and others similarly situated pension benefits untainted by pregnancy-based discrimination.

## II

The Court's rejection of plaintiffs' claims to pension benefits undiminished by discrimination "because of [their] sex," 42 U. S. C. §2000e–2(h), centers on §703(h) of Title VII, as construed by this Court in *Teamsters* v. *United States*, 431 U. S. 324 (1977). See *ante*, at 4–8. Section 703(h) permits employers "to apply different standards of compensation . . . pursuant to a bona fide seniority . . . system." 42 U. S. C. §2000e–2(h). Congress enacted §703(h), *Teamsters* explained, to "exten[d] a measure of immunity" to seniority systems even when they "operate to 'freeze' the status quo of prior discriminatory employment practices." 431 U. S., at 350 (quoting *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 430 (1971)).

*Teamsters* involved a seniority system attacked under Title VII as perpetuating race-based discrimination. Minority group members ranked low on the seniority list because, pre-Title VII, they were locked out of the job category in question. But the seniority system itself, the Court reasoned, "did not have its genesis in . . . discrimination," contained no discriminatory terms, and applied "equally to all races and ethnic groups," 431 U. S., at 355–356. Therefore, the Court concluded, §703(h) sheltered the system despite its adverse impact on minority group

members only recently hired for, or allowed to transfer into, more desirable jobs. See *id.*, at 356.

This case differs from *Teamsters* because AT&T's seniority system itself was infected by an overt differential. Cf. *ante*, at 8 ("[R]ule of differential treatment was an element of the seniority system itself . . . ."). One could scarcely maintain that AT&T's scheme was "neutral on [its] face and in intent," discriminating against women only "in effect." Cf. *Teamsters*, 431 U. S., at 349. Surely not a term fairly described as "equally [applicable] to all," *id.*, at 355, AT&T's prescription regarding pregnancy leave would gain no immunity under §703(h) but for this Court's astonishing declaration in *Gilbert:* "[E]xclusion of pregnancy from a disability-benefits plan providing general coverage," the Court decreed, "[was] not a gender-based discrimination at all." 429 U. S., at 136. See *ante*, at 8 (because of *Gilbert*, AT&T's disadvantageous treatment of pregnancy leave "did not taint the system under the terms of [§703(h)]").

Were the PDA an ordinary instance of legislative revision by Congress in response to this Court's construction of a statutory text, I would not dissent from today's decision. But Congress made plain its view that *Gilbert* was not simply wrong about the character of a classification that treats leave necessitated by pregnancy and childbirth disadvantageously. In disregarding the opinions of other courts, see *supra*, at 2, n. 2, of the agency that superintends enforcement of Title VII, see *supra*, at 2,[5] and, most

---

[5] The Equal Employment Opportunity Commission's (EEOC) current Compliance Manual counsels: "While the denial of service credit to women on maternity leave was not unlawful when [the charging party] took her leave . . . , the employer's decision to incorporate that denial of service credit in calculating seniority [post-PDA] is discriminatory." 2 EEOC Compliance Manual §3, p. 627:0023 (effective Oct. 3, 2000). EEOC compliance manuals, this Court has recognized, "reflect 'a body of experience and informed judgment to which courts and litigants may

fundamentally, the root cause of discrimination against women in the paid labor force, this Court erred egregiously. Congress did not provide a remedy for pregnancy-based discrimination already experienced before the PDA became effective. I am persuaded by the Act's text and legislative history, however, that Congress intended no continuing reduction of women's compensation, pension benefits included, attributable to their placement on pregnancy leave.

## III

A few further considerations influence my dissenting view. Seeking equal treatment only from and after the PDA's effective date, plaintiffs present modest claims. As the Court observes, they seek service credit, for pension benefit purposes, for the periods of their pregnancy leaves. For the named plaintiffs, whose claims are typical, the uncounted leave days are these: "seven months . . . for Noreen Hulteen; about six months for Eleanora Collet; and about two for Elizabeth Snyder and Linda Porter." *Ante*, at 3. See also 498 F. 3d 1001, 1004 (CA9 2007) (en banc) (case below). Their demands can be met without disturbing settled expectations of other workers, the core concern underlying the shelter §703(h) provides for seniority systems. See *Franks* v. *Bowman Transp. Co.*, 424 U. S. 747, 766, 773, and n. 33 (1976) ("'benefit' seniority," unlike "'competitive status' seniority," does not conflict with economic interests of other employees).

Furthermore, as Judge Rymer explained in her opinion dissenting from the Ninth Circuit's initial panel opinion, 441 F. 3d 653, 665–666 (2006), the relief plaintiffs request is not retroactive in character. Plaintiffs request no backpay or other compensation for past injury. They seek

_____

properly resort for guidance.'" *Federal Express Corp.* v. *Holowecki*, 552 U. S. ___, ___ (2008) (slip op., at 8) (quoting *Bragdon* v. *Abbott*, 524 U. S. 624, 642 (1998)).

pension benefits, now and in the future, equal to the bene-fits received by others employed for the same length of time. The actionable conduct of which they complain is AT&T's denial of equal benefits to plaintiffs "in the post-PDA world." *Id.*, at 667.

Nor does it appear that equal benefits for plaintiffs during their retirement years would expose AT&T to an excessive or unmanageable cost. The plaintiffs' class is not large; it comprises only women whose pregnancy leaves predated April 29, 1979 and whose employment continued long enough for their pensions to vest. The periods of service involved are short—several weeks or some months, not years. And the cost of equal treatment would be spread out over many years, as eligible women retire.

## IV

Certain attitudes about pregnancy and childbirth, throughout human history, have sustained pervasive, often law-sanctioned, restrictions on a woman's place among paid workers and active citizens. This Court so recognized in *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721 (2003). *Hibbs* rejected challenges, under the Eleventh and Fourteenth Amendments, to the Family and Medical Leave Act of 1993, 107 Stat. 6, 29 U. S. C. §2601 *et seq.*, as applied to state employees. The Court's opinion featured Congress' recognition that,

> "[h]istorically, denial or curtailment of women's em-ployment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women's roles has in turn justified discrimina-tion against women when they are mothers or moth-ers-to-be." Joint Hearing before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Edu-

cation and Labor, 99th Cong., 2d Sess., 100 (1986)
(quoted in *Hibbs*, 538 U. S., at 736).[6]

Several of our own decisions, the opinion in *Hibbs* ac-
knowledged, 538 U. S., at 729, exemplified the once "pre-
vailing ideology." As prime illustrations, the Court cited
*Bradwell* v. *State*, 16 Wall. 130 (1873);[7] *Muller* v. *Oregon*,
208 U. S. 412 (1908);[8] *Goesaert* v. *Cleary*, 335 U. S. 464
(1948);[9] and *Hoyt* v. *Florida*, 368 U. S. 57 (1961).[10] The
*Hibbs* opinion contrasted *Muller*, *Goesaert*, and *Hoyt* with
more recent opinions: Commencing in 1971, the Court had
shown increasing awareness that traditional sex-based
classifications confined or depressed women's oppor-
tunities. 538 U. S., at 728–730. Representative of the
jurisprudential change, *Hibbs* cited *Reed* v. *Reed*, 404
U. S. 71 (1971);[11] *Frontiero* v. *Richardson*, 411 U. S. 677

---

[6] See also H. R. Rep. No. 95–948, pp. 6–7 ("Women are still subject to
the stereotype that all women are marginal workers. Until a woman
passes the child-bearing age, she is viewed by employers as potentially
pregnant.").

[7] *Bradwell* upheld a State's exclusion of women from the practice of
law. In an exorbitant concurring opinion, Justice Bradley wrote that
"the female sex [is] evidently unfi[t] . . . for many of the occupations of
civil life." 16 Wall., at 141. He elaborated: "The paramount destiny
and mission of woman are to fulfil the noble and benign offices of wife
and mother. This is the law of the Creator." *Ibid.*

[8] *Muller* upheld a State's hours-of-work limitation applicable to
women only. "[T]o preserve the strength and vigor of the race," the
Court observed, "the physical well-being of woman becomes an object of
public interest and care." 208 U. S., at 421. Cf. *Automobile Workers* v.
*Johnson Controls, Inc.*, 499 U. S. 187, 211 (1991) ("Concern for a
woman's existing or potential offspring historically has been the excuse
for denying women equal employment opportunities.").

[9] *Goesaert* upheld a state law prohibiting women from working as
bartenders (unless the woman's husband or father owned the tavern).

[10] *Hoyt* sustained a state law exempting all women from the obliga-
tion to serve on juries.

[11] *Reed* invalidated a state law that preferred males to females for
appointment as estate administrators.

(1973);[12] *Craig* v. *Boren*, 429 U. S. 190 (1976);[13] and *United States* v. *Virginia*, 518 U. S. 515 (1996).[14]

*Gilbert* is aberrational not simply because it placed outside Title VII disadvantageous treatment of pregnancy rooted in "stereotype-based beliefs about the allocation of family duties," *Hibbs*, 538 U. S., at 730; *Gilbert* also advanced the strange notion that a benefits classification excluding some women ("pregnant women") is not sex-based because other women are among the favored class ("nonpregnant persons").[15] The very first Title VII sex-discrimination case heard by the Court, *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971) *(per curiam)*, however, rejected similar reasoning. At issue in *Phillips* was an employer's refusal to hire mothers of pre-school-age children. *Phillips* yielded a *per curiam* opinion recognizing that Title VII applies to classifications disadvantageous to some, but not most, women. See, *e.g.*, *Phillips* v. *Martin Marietta Corp.*, 416 F. 2d 1257, 1262 (CA5 1969) (Brown, C. J., dissenting from denial of en banc review) ("A mother is still a woman. And if she is denied work outright because she is a mother, it is because she is a woman. Congress said that could no longer be done."); *Sprogis* v. *United Air Lines, Inc.*, 444 F. 2d 1194 (CA7

---

[12] *Frontiero* extended to married female members of the uniformed services spousal benefits granted by statute automatically only to male members.

[13] *Craig* held that young men were entitled to purchase 3.2% beer at the same age as young women.

[14] Virginia, the Court held, could not maintain the Virginia Military Institute as an all-male college without offering women a genuinely equal educational opportunity. For a fuller account of the Court's decisions on the constitutionality of gender-based classifications, see *Virginia*, 518 U. S., at 531–534.

[15] The terms "pregnant women" and "nonpregnant persons" first appeared in *Geduldig*, 417 U. S., at 496–497, n. 20. See *supra*, at 1, n. 1. *Gilbert* repeated the terms, quoting the footnote in *Geduldig*, 429 U. S., at 135.

(refusal to employ married women violates Title VII), cert. denied, 404 U. S. 991 (1971).[16]

Grasping the connection *Gilbert* failed to make, a District Court opinion pre-*Gilbert*, W*etzel* v. *Liberty Mut. Ins. Co.*, 372 F. Supp. 1146 (WD Pa. 1974), published this deft observation. In response to an employer's argument that its disadvantageous maternity leave and pregnancy disability income protection policies were not based on sex, the court commented: "[I]t might appear to the lay mind that we are treading on the brink of a precipice of absurdity. Perhaps the admonition of Professor Thomas Reed Powell to his law students is apt; 'If you can think of something which is inextricably related to some other thing and not think of the other thing, you have a legal mind.'" *Id.*, at 1157.

Congress put the Court back on track in 1978 when it amended Title VII to repudiate *Gilbert*'s holding and reasoning. See *Newport News*, 462 U. S., at 678; *California Fed.*, 479 U. S., at 284–285; *supra*, at 4–5.[17] Congress'

_____

[16] See also the EEOC's Guideline, initially published in 1965, and now codified in 29 CFR §1604.4:

"The Commission has determined that an employer's rule which forbids or restricts the employment of married women and which is not applicable to married men is a discrimination based on sex prohibited by Title VII of the Civil Rights Act. It does not seem to us relevant that the rule is not directed against all females, but only against married females, for so long as sex is a factor in the application of the rule, such application involves a discrimination based on sex." 30 Fed. Reg. 14928 (1965).

[17] For critical commentary on *Gilbert* and its forerunner, *Geduldig* v. *Aiello*, see, *e.g.*, Bartlett, Pregnancy and the Constitution: The Uniqueness Trap, 62 Calif. L. Rev. 1532, 1551–1566 (1974); Eskridge, America's Statutory "constitution," 41 U. C. D. L. Rev. 1, 39–40, and n. 175 (2007); Karst, The Supreme Court 1976 Term Foreword: Equal Citizenship Under the Fourteenth Amendment, 91 Harv. L. Rev. 1, 54, n. 304 (1977); Law, Rethinking Sex and the Constitution, 132 U. Pa. L. Rev. 955, 983–984, and nn. 107–109 (1984); Roelofs, Sex Discrimination and Insurance Planning: The Rights of Pregnant Men and Women Under

swift and strong repudiation of *Gilbert*, the Court today holds, does not warrant any redress for the plaintiffs in this case. They must continue to experience the impact of their employer's discriminatory—but, for a short time, *Gilbert*-blessed—plan. That outcome is far from inevitable. It is at least reasonable to read the PDA to say, from and after the effective date of the Act, no woman's pension payments are to be diminished by the pretense that pregnancy-based discrimination displays no gender bias.

I would construe the Act to embrace plaintiffs' complaint, and would explicitly overrule *Gilbert* so that the decision can generate no more mischief.

\* \* \*

For the reasons stated, I would affirm the Ninth Circuit's judgment.

_____

*General Electric Co.* v. *Gilbert*, 22 St. Louis U. L. J. 101, 120–123 (1978); Schwartz, Equalizing Pregnancy: The Birth of a Super-Statute 33–57 (2005), http://lsr.nellco.org/yale/ylsspps/papers/41 (as visited May 14, 2009, and in Clerk of Court's case file); Siegel, Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection, 44 Stan. L. Rev. 261, 268–272 (1992); Siegel, You've Come a Long Way, Baby: Rehnquist's New Approach to Pregnancy Discrimination in *Hibbs*, 58 Stan. L. Rev. 1871, 1873, 1878, 1891–1893 (2006); Taub & Williams, Will Equality Require More Than Assimilation, Accommodation or Separation from the Existing Social Structure?, 37 Rutgers L. Rev. 825, 832–836 (1985).